IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACQAUS L. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:03cv3101 |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| RANDY CROSBY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

  This matter is before the court on the following pending motions: (1) filing no. 82, the Motion for Summary Judgment filed by the remaining defendants in this action, Randy Crosby and Peter Reed, each in his individual capacity only; (2) filing no. 99, the Motion for Summary Judgment filed by the plaintiff, JacQaus L. Martin, a prisoner in the custody of the Nebraska Department of Correctional Services ("DCS"); (3) filing no. 104, the plaintiff's Motion for Writ of Mandamus; (4) filing no. 108, the plaintiff's Motion to Show Damages; and (5) filing no. 110, the plaintiff's Motion to Admit Evidence into the Record. The plaintiff asserts claims pursuant to 42 U.S.C. § 1983, alleging that a strip search of his person on May 5, 2000, at the Nebraska State Penitentiary ("NSP"), violated his civil rights.

**Filing Nos. 104, 108, 110**

  In filing no. 104, the plaintiff filed a Petition for Writ of Mandamus to require this court to rule on his Motion for Summary Judgment. Filing no. 104 is denied as moot because this Memorandum and Order constitutes a decision on the parties' cross-motions for summary judgment.

  In filing nos. 108 and 110, the plaintiff moves for leave to introduce evidence of the injuries he suffered in segregation and of operational memoranda and other documents

which are relevant to the subject matter of his claims. Filing nos. 108 and 110 are granted insofar as the evidence is accepted for filing instanter, the documents are incorporated into the record of this case, and the evidence has been considered by the court in the context of the parties' pending motions for summary judgment.

### Fourth Amendment Standard

In Bell v. Wolfish, 441 U.S. 520, 559 (1979), the United States Supreme Court established the following Fourth Amendment standard for evaluating the legality of strip searches in a prison environment:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted .... A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record ... and in other cases.[1]

Thus, in a prison setting, a strip search may be conducted on less than probable cause, despite the privacy interest of a detainee or convicted prisoner. Id. at 560.

On May 5, 2000, the plaintiff was confined in a segregation unit, otherwise known as the "control unit" or the "special management unit," of the NSP. His request to make a legal telephone phone call had been approved, and to place the call, he had to be escorted out of the secure area of the control unit. Pursuant to NSP Operational Memorandum ("O.M.") 203.001.114 ("Searches for Contraband") (exhibit to filing no. 110)

---

[1] Bell v. Wolfish, 441 U.S. 520 (1979), involved pretrial detainees, but the balancing of interests enunciated in Bell applies also to convicted prisoners like the plaintiff.

at § V.C.1.b.(1)(c), strip searches shall be conducted upon entry to or release from administrative or disciplinary segregation units.

O.M. 203.001.114 distinguishes between **visual** body cavity examinations and body cavity searches.  The former involves a visual inspection of an inmate's naked body including body cavities, while the latter involves the same, as well as a digital probe or insertion of an instrument into one or more body orifice(s).  See also Wood v. Hancock County Sheriff's Dept., 354 F.3d 57, 63 (1st Cir. 2003): "'[S]trip search' is an 'umbrella term' covering several increasingly intrusive procedures.  In addition to the general term, defined as ['an inspection of a naked individual, without any scrutiny of the subject's body cavities,'] ... a '"visual body cavity search" extends to visual inspection of the anal and genital areas' and ... a '"manual body cavity search"' includes some degree of touching or probing of body cavities.'..." (Citations and some internal quotation marks omitted.)  This case involves a visual body cavity search, with no probe or penetration.

At the NSP, a strip search involving visual inspection of body cavities usually involves no touching of the prisoner, who is supposed to remove his clothes, bend over, lift his testicles, spread his own buttocks, and allow visual inspection of his anal area. However, when the plaintiff refused at least two direct orders to submit to a strip search on May 5, 2000, a "use of force team," assembled pursuant to NSP O.M. 116.002.101 ("Use of Force") (see "cover sheet," exhibit to filing no. 110),[2] placed restraints on the plaintiff and conducted the search.  The plaintiff alleges that the team used excessive force in restraining and searching him.  Also, part of the search involved spreading the plaintiff's

---

[2]The NSP O.M. 116.002.101 "cover sheet" authorizes use of force procedures, among other situations, "[t]o ensure that inmates carry out lawful orders."  (Filing no. 110.)

3

buttocks to enable a visual body cavity examination, which the plaintiff characterizes as a sexual assault on his person because his genital and anal areas were touched by at least one corrections officer (defendant Peter Reed).

## Balancing of Interests

Inmates retain at least a limited right of bodily privacy even in the prison context. Moore v. Carwell, 168 F.3d 234, 236-37 (5th Cir. 1999); Peckham v. Wisconsin Dept. of Corrections, 141 F.3d 694, 697 (7th Cir. 1998); Somers v. Thurman, 109 F.3d 614, 618 (9th Cir.), cert. denied, 522 U.S. 852 (1997); Hayes v. Marriott, 70 F.3d 1144, 1146 (10th Cir.1995); Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir.1993); Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992); Cornwell v. Dahlberg, 963 F.2d 912, 916 (6th Cir. 1992). See also Timm v. Gunter, 917 F.2d 1093, 1098 n. 4 (8th Cir. 1990) (assuming, without deciding, that inmates retain some constitutional right to privacy), cert. denied, 501 U.S. 1209 (1991).

Scope of the Intrusion

Pursuant to Bell v. Wolfish, 441 U.S. at 559, to determine whether a particular strip search meets the Fourth Amendment standard of reasonableness, the invasion of the plaintiff's personal rights must be weighed against the need for the search. There is no question that strip searches are invasive. See Bell v. Wolfish, 441 U.S. at 560-61: "We do not underestimate the degree to which these searches may invade the personal privacy of inmates." See also Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983), adopting the opinion that "strip searches involving the visual inspection of the anal and genital areas [are] 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission ....'" (Citations omitted.) Against this intrusion the court balances the justification for the particular search,

also considering the manner and place in which it was conducted. Bell v. Wolfish, 441 U.S. at 559.

Place

The plaintiff does not complain that the place in which the search was conducted, i.e, the bullpen of the NSP control unit, exposed him to further loss of privacy by subjecting his naked body to the view of other inmates or staff. In addition, the use of force team consisted of men only, and, although a female nurse attended the plaintiff, the plaintiff does not complain of her presence.[3]

Manner

As no digital probe or other intrusion into the plaintiff's body cavities occurred, the search constituted a visual body cavity examination, notwithstanding that a "use of force" team conducted it and that the team had to touch the plaintiff's body, including his buttocks, to accomplish the search. Therefore, § V.C.1.c. of NSP O.M. 203.001.114 ("Searches for Contraband"), relating to "[m]anual or instrument inspection of body cavities" and requiring just cause, authorization by the NSP Chief Executive Officer, and participation solely by medical staff, did not apply.

The plaintiff does not allege that the defendants or the other officers involved in the search employed derogatory, threatening or abusive comments or racial epithets. See generally Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005):

> We also conclude the manner in which Officer Stephens conducted the strip search violated Plaintiffs' constitutional rights. Though not directly applicable to this case, Bell acknowledged that even correctional officers in

---

[3] With respect to the nurse, the plaintiff complains only of her report that he suffered no abrasions or other injuries from the restraints.

5

> a jail cannot properly conduct strip searches of incarcerated inmates in 'an abusive fashion.' 441 U.S. at 560... (internal citations omitted). Abuse cannot be condoned. While searches need not be delicately conducted in the least intrusive manner, they must be conducted in a reasonable manner .... In considering the totality of the circumstances, we also consider Officer Stephens's language .... From the time Plaintiffs were secured in the patrol car until the end of the search, Stephens used threatening and racist language. We accept that such language has an impact on people and counts towards the unreasonableness of the manner of the searches.

Id. at 1281-82 (alleged manner in which police officer conducted strip searches of arrestees, if proven, violated plaintiffs' Fourth Amendment rights, and qualified immunity did not shield the officer from the plaintiffs' claims challenging the manner of the searches).

The plaintiff does complain of the degree of force used to conduct the search. The Eighth Circuit Court of Appeals explained the principles governing prisoner claims of excessive force in Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002), as follows: "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers, Whitley v. Albers, 475 U.S. 312, 319 ... (1986), regardless of whether an inmate suffers serious injury as a result. Hudson v. McMillian, 503 U.S. 1, 9 ... (1992). Officers are permitted to use force reasonably 'in a good-faith effort to maintain or restore discipline,' but force is not to be used 'maliciously and sadistically to cause harm.' Id. at 7...."

The videotape and incident reports of the search on May 5, 2000 do not reveal an excess of force. Five officers participated in the process, which was brief and methodical. Each officer had an assigned body part (e.g., the plaintiff's head, arm, legs, buttocks). As for harm suffered by the plaintiff, even with the serious weight loss and skin irritations described by the plaintiff in filing no. 108 as a result of his time in segregation, the plaintiff does not identify injuries attributable to the single incident on May 5, 2000. The record

6

simply does not contain evidence of a malicious and sadistic use of force to cause harm, an unnecessary and wanton infliction of pain, an exaggerated and disproportionate response to misconduct, or any specific injury to the plaintiff on May 5, 2000.  See generally Hudson v. McMillian, 503 U.S. 1, 9 (1992); Whitley v. Albers, 475 U.S. 312, 319 (1986);  Hickey v. Reeder, 12 F.3d 754, 756-59 (8th Cir. 1993).  As the search on May 5, 2000 was not conducted in a violent or unprofessional manner, and the degree of force used did not otherwise violate the Constitution, the unconsented and forcible nature of the search did not render it unreasonable under the Fourth Amendment.

Justification for the Search

The defendants rely on O.M. 203.001.114 which reflects the policy that strip searches shall be conducted upon an inmate's entry to or release from an NSP segregation unit.   "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).  "[A]dministrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives."  Block v. Rutherford, 468 U.S. 576, 591 n.11 (1984); *citing* Bell v. Wolfish, 441 U.S. at 542, n. 25 ("Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional").

The plaintiff does not dispute that a visual body cavity examination may be justified when an inmate has contact with visitors or facilities outside of the institution.  However, as he never had contact with visitors or left the control unit before the search on May 5, 2000, the plaintiff contends that O.M. 203.001.114 is too broad, serving no penological purpose in his circumstances; the defendants lacked any reasonable suspicion to support

7

a strip search, particularly of his genital and anal areas; and, because unjustified, the search must necessarily have been for the purpose of harassing, intimidating or retaliating against him because he wanted to place a telephone call.

It is true that just because the NSP has a policy does not, by itself, justify a strip search every time an inmate leaves or enters the NSP control unit. While the defendants have not explained the historical reasons for the policy on which they rely, the court can take judicial notice of its own records in Case No. 4:03cv3100, Martin v. Hayne, et al. (D. Neb.). In that case, Chief Judge Joseph F. Bataillon conducted a bench trial involving the same plaintiff, a visual body cavity search under virtually identical circumstances on May 16, 2000, and the same NSP policies.

In his findings of fact and conclusions of law in a Memorandum of Law of December 9, 2005, Judge Bataillon set forth the rationale provided by NSP personnel for requiring a visual body cavity examination each time an inmate leaves or re-enters the NSP control unit through the bullpen:

> 14. Strip searches are conducted because (1) small openings that exist in each of the segregation cells that allow for air passage and delivery of food allow prisoners going to the bullpen to pass alone by the cells of other inmates; (2) inmates drop towels and other articles next to the segregated cell doors that contain items that are distributed to other inmates, allowing for the possibility of "items to person contact"; (3) when inmates go to the exercise yard, there are metal objects and wire that an inmate could obtain and fashion a weapon; and (4) an inmate could throw something from the general population yard into the segregation yard, a scenario that has happened in the past.
>
> 15. Officer Crosby testified that he has personal knowledge of contraband making its way into the segregated cell. He also testified that security in the segregation unit is different, as it is heightened with more aggressive and violent behaviors. He further testified that he knew of instances where inmates had taped contraband to the genital areas.

> 16. Inmates in the general population, those working in the soap factory, and those using the sweat lodges have access to throwing contraband into the segregation area. Officer Crosby testified that a number of items that are designed to be hidden in body cavities are thrown into the segregated area; that weapons are manufactured from materials inside the cell; and that employees have been injured from contraband.

(Case No. 4:03cv3100, filing no. 137 at 4-5.)

In this case, the court does not adopt Judge Bataillon's findings as factually unimpeachable, because the underlying testimony was not introduced into the record of this case. However, assuming that the defendants would have presented the same historical reasons for the identical policy on which they rely in this case, the court would have deferred to the defendants' *opinions* as to the penological purpose for the policy of searching inmates upon exit from and entry to the secure part of the NSP segregation unit. The interests of prison officials in preserving order, discipline and security are considered paramount penological objectives to which a court must accord broad deference under Bell v. Wolfish, 441 U.S. at 546-48, Block v. Rutherford, 468 U.S. at 591, and Turner v. Safley, 482 U.S. at 87, among other decisions.

In cases involving strip searches of convicted prisoners, the balance of interests expressed in Bell v. Wolfish tends to favor institutional security concerns. In particular, when an inmate, like the plaintiff, is located in a maximum security facility or in a segregation unit housing more dangerous prisoners than the general population, policies allowing routine strip searches upon entry to and departure from the unit tend to be upheld. See, e.g., Peckham v. Wisconsin Dept. of Corrections, 141 F.3d 694, 695-97 (7th Cir. 1998) (rule authorizing strip searches whenever a prisoner moved into segregation or when time was tacked onto a prisoner's term in segregation did not violate the Fourth or Eighth

9

Amendment); Franklin v. Lockhart, 883 F.2d 654, 656-57 (8th Cir. 1989) (policy requiring visual body cavity searches of inmates on punitive status, in administrative segregation, and on protective custody was justified by security concerns); Goff v. Nix, 803 F.2d 358, 362-66 (8th Cir. 1986), cert. denied, 484 U.S. 835 (1987) (regulation requiring visual body cavity examination of inmates leaving or entering segregation unit of maximum security facility upheld in light of security considerations); Arruda v. Fair, 710 F.2d 886, 886-88 (1st Cir.), cert. denied, 464 U.S. 999 (1983) (policy requiring strip searches of the institution's most dangerous inmates as they departed from, and entered into a sensitive area of a maximum security prison upheld because security concerns provided a compelling justification for the institution's policy).

### Sexual Assault

As discussed in the foregoing cases, the legal validity of a particular visual body cavity search is subject to a balancing test. Consequently, it is clear that such a search is not, solely by reason of its intrusive nature, an illegal sexual assault and that a visual body cavity search does not per se violate the Fourth, Eighth or Fourteenth Amendments to the United States Constitution. Because the plaintiff alleges no facts beyond the spreading of his buttocks by defendant-Reed and the visual inspection of his anal and genital areas, acts which the Constitution does not prohibit, his claim of sexual assault fails.

### Summary Judgment

The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the opponent must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." Id. at 586.

"[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law .... Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). Accord Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 529 (8th Cir. 2003). "If the evidence is merely colorable ... or is not sufficiently probative ... summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The court may not weigh the evidence, determine credibility, or decide the truth of any factual matter in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. In this case, there exists insufficient evidence in the record favoring the plaintiff on which a jury could return a verdict in his favor. Id. The plaintiff has no triable claim based on the Fourth, Eighth or Fourteenth Amendments to the United States Constitution.

IT IS THEREFORE ORDERED:

1. That filing no. 82, the defendants' Motion for Summary Judgment, is granted;

2. That filing no. 99, the plaintiff's Motion for Summary Judgment, is denied;

3. That filing no. 104, the plaintiff's Motion for Writ of Mandamus, is denied;

4. That filing nos. 108 and 110, the plaintiff's Motion to Show Damages, and the plaintiff's Motion to Admit Evidence into the Record, are granted insofar as the evidence is accepted for filing instanter, the documents are incorporated into the record of this case, and the evidence has been considered by the court in the context of the parties' pending motions for summary judgment; and

5. That a separate judgment will be entered in accordance with Fed. R. Civ. P. 58, dismissing the plaintiff's complaint and this action with prejudice.

DATED this 21st day of February, 2006.

BY THE COURT:

s/Laurie Smith Camp
Laurie Smith Camp
United States District Judge